CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY V. WILLIAM SPORER, ADMINISTRATOR OF THE ESTATE OF HENRY J. HENNINGS, DECEASED.

FILED MAY 6, 1903.    No. 10,678.

1. Directing Verdict. The trial court is not required to submit a case to the jury unless the evidence supporting it is of such a character that it would warrant the jury in basing a verdict upon it.

2. ———: CONFLICTING EVIDENCE. Conflicting evidence is for the jury,

and when there is a conflict of evidence upon a material issue it is error to direct a verdict for either party.

3. ———: ———. Evidence may be said to be conflicting when there is substantial evidence upon either side of the controversy. A fact may be so conclusively established that slight evidence suspicious and uncertain will not be allowed to oerthrow it.

4. Duty of Railway in Constructing Crossing. It is the duty of a railway company in constructing its crossings over a highway to take all reasonable precautions to lessen the danger to the public in crossing its road.

5. Negligence: QUESTION FOR JURY. In this case it was for the jury to determine the rate of speed at which defendant's train was running at the time of the accident, and whether, under the conditions obtaining at the crossing, the company was negligent in running its train at such rate of speed.

6. Instructions. Conflicting instructions are erroneous, and one which misstates the law upon a vital issue is not cured by another which states the law correctly.

ERROR to the district court for Cass county: BASIL S. RAMSEY, DISTRICT JUDGE. *Reversed.*

*W. F. Evans, Samuel M. Chapman, Lorenzo W. Billings-ley, Robert J. Greene, Richard H. Hagelin, William V. Allen* and *Willis E. Reed,* for plaintiff in error.

*Harvey D. Travis* and *Jesse L. Root, contra.*

SEDGWICK, J.

The plaintiff's intestate was killed by one of the defendant's trains, while he was driving across its track between the stations of Murdock and South Bend in Cass county. He recovered a judgment for damages in the district court for Cass county, which the company has brought here for review. Defendant's passenger train running from Lincoln to Omaha left Murdock about ten minutes behind its schedule time; and at the second section line crossing from Murdock the accident occurred. The petition alleged that the defendant was negligent in constructing its railway at the crossing of the highway and that it so negligently and carelessly operated its train that "no

whistle was sounded or bell rung before it approached said crossing," and was carelessly running its train at a high rate of speed, to wit, about sixty miles an hour. The defendant denied these allegations of negligence and alleged contributory negligence on the part of the deceased.

Just south of the highway on which the deceased was driving there is a rise of ground or hill from three hundred to four hundred feet in height. The railway runs in a northeasterly direction from Murdock and, as it passes along on the east side of this hill, bends toward the north and crosses the highway nearly at right angles, and extends therefrom eastward in a straight line for a distance of from one-half a mile to a mile. It has a downward grade continuously from Murdock until after the crossing in question is passed, and as it passes the crossing in question, runs through a deep cut along the brow of the hill which at a distance of about twelve hundred or fifteen hundred feet from the crossing is sixteen feet in depth. From this point to the crossing the depth of the cut gradually diminishes until when the track reaches the crossing it is not more than four feet in depth. In making this cut the earth was thrown up in embankments and the ground is cultivated in crops, so that in June, when this accident occurred, a train approaching through this cut can not be seen by a person approaching the crossing from the west when more than two hundred feet from the crossing. The deceased was driving with a team and single seated covered buggy with his little girl five or six years old, who was sleeping in the forward part of the box of the buggy, and approached this crossing from the west. The team was struck by the train and the horses and driver were instantly killed and the buggy destroyed. The child seems not to have been injured.

1. It is contended that there was negligence shown on the part of the company in running the train. The conductor, engineer and fireman, and other employees of the railroad company testified positively and clearly that the whistle was duly sounded at the proper distance from

the crossing and continuously until the train approached the crossing, and that the bell rang also continuously. The evidence of these witnesses should of course have been given its proper weight in determining that question.

We quote from the evidence of some of the other witnesses upon this point as follows: John Stroy, Sr., who was a farmer and had lived on an adjoining section for twenty-two years, was asked:

Q. Do you know where the crossing is?

A. Yes, sir.

Q. At the time of the accident how far were you from the crossing?

A. About eighty rods.

Q. Which way?

A. East of the track.

Q. What were you doing?

A. Going over, crossing there to my son's place.

Q. Go ahead in your own way and tell the court and jury just what you saw and what you heard in the way of sounding the whistle.

A. I went over across to see my son, I saw the train coming out of the cut, not this cut up to the crossing, a little cut a little further south, and when the train came out of that cut and before she got to the whistling post, I saw the steam pipe up and I heard the whistle and they did that four times, but the last time I couldn't see the steam because they got behind the grove; I am positive that they whistled four times before they got to the crossing.

Q. You know where the whistling post is do you?

A. Yes, sir.

Q. You had known the railroad at this point ever since it was constructed?

A. Oh, yes, I know every foot.

Q. You speak of the train coming out from in the cut, what cut do you mean?

A. The cut south of the whistling post.

Q. The one you speak of is south of the whistling post?

A. Yes, sir.

Q. The whistling post is between two cuts?

A. Yes, sir.

Q. State whether it was coming out of the south cut when you first saw it.

A. Yes, sir.

Q. State whether or not, Mr. Stroy, the train was coming out of the south cut when it first whistled and whether or not it was before it reached the whistling post.

A. It came out of the south cut and before it seemed to come to the whistling post, as I said before, I saw the steam pop up on the engine and then directly the sound came from the whistle.

Q. How far would you say that whistle could be heard, what distance?

A. I should judge about two or three miles.

Q. Was it plain and distinct?

A. Just as plain as could be.

Q. You had no difficulty in hearing it?

A. No, sir.

Q. How far were you from it?

A. Eighty rods.

In an able and searching cross-examination his evidence was strengthened rather than discredited.

Henry Baumgardner was plowing corn in a field just east of the crossing at the time of the accident, and testified as follows:

Q. Do you remember the time of the accident in question?

A. Yes, sir.

Q. Where were you at that time?

A. Plowing corn.

Q. Who for, at that time?

A. Mr. Stroy.

Q. And where were you plowing corn?

A. About twenty or thirty rods east of the railroad track.

Q. You know where the crossing is in question?

A. Yes, sir.

Q. You know where the whistling post south of that crossing is?

A. Yes, sir.

Q. Which way were you from the crossing?

A. East side of the railroad.

Q. How far from the railroad?

A. About twenty or thirty rods.

Q. Did you see the train that collided with the team?

A. No, sir.

Q. Did you hear it?

A. No, sir.

Q. I mean the train that was in the collision, did you see that train that day?

A. Yes, sir.

Q. Where did you first see it?

A. I saw the train coming through the cut.

Q. Which cut do you speak of?

A. The cut where the accident happened.

Q. Where did you first see the train, where was it when you first saw it?

A. North of that grove there when it passed the grove.

Q. Was it north or south of the whistling post?

A. A little bit north.

Q. When did you hear the train whistle if at all?

A. It was south of the whistling post.

Q. How many times did you hear the train whistle?

A. Several times.

Q. How long did it continue to whistle, where was the train when the whistling stopped?

A. It whistled all the way through the cut.

Q. Commenced whistling, you say, south of the whistling post?

A. Yes, sir.

Q. How far south of the whistling post was it when you heard it whistle?

A. I couldn't say how far it was south.

Q. Was it a loud whistle?

A. Oh, I couldn't say that, how loud it was.

Q. How far do you think a person could hear the whistle?

A. A couple of miles.

J. C. Stroy, Jr., who was also plowing corn in a field but a few rods from where the accident occurred testified as clearly and directly to the same effect. Also Mr. Lefler, who was buying grain at the time and was driving across the country with his team, and was about a mile east of the crossing where the accident happened, who testified that he saw the train when it was leaving Murdock, heard it whistle at the crossing a mile from Murdock, and heard it whistle at the crossing in question. He says that he heard it whistle several times while it was south of the crossing and that there were several blasts each time, he could hear it plainly.

Several others who were working in the fields near by the accident testified clearly and positively to the same facts.

Also some passengers upon the train gave clear and positive testimony to the same effect. The plaintiff produced but one witness who testified upon that point. This was Henry Hollenbeck, a pasenger on the train, who was asked:

Q. State whether or not they whistled or rang the bell before reaching the crossing.

A. No, sir, I don't think they did.

And upon cross-examination he was questioned, and answered as follows:

Q. How far was the train north of the crossing when you heard the whistling?

A. They had commenced slacking up.

Q. About how far north of the crossing?

A. Probably a quarter of a mile.

Q. When you heard the whistle the first time?

A. Yes, sir.

Q. Now prior to that time, all you know is, you **didn't** hear any bell or whistle?

A. No, sir, I didn't hear any whistle or bell.

Q. This is all you know about it that you didn't hear any whistle or bell?

A. I know I didn't hear it.

Q. This is all you do know about it, isn't it?

A. I don't think they whistled.

Q. You don't know?

A. I am willing to swear that they did not whistle.

On re-direct examination he was asked.

Q. With reference to the time you felt this jolt, when did the whistle sound?

A. Some time after.

Q. Right after?

A. Yes, sir.

The defendant then asked him:

Q. About a quarter of a mile from the crossing?

A. Yes, sir, I should think so.

He was then asked by the plaintiff:

Q. You wish the jury to understand that the train didn't commence whistling until about the time it stopped?

Defendant excepted as leading and suggestive, and the court said:

"State the facts." Whereupon he answered:

A. Yes, sir, they commenced whistling, well after they commenced to stop, the first I heard after I felt the jar, I heard the whistle.

This was all of the testimony given by this witness upon this point. It is to the effect that he heard the whistle after the train had passed the crossing about a quarter of a mile and that he did not hear the whistle before that time.

"Judges are no longer required to submit a case to the jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury to proceed in finding a verdict in favor of the party introducing such evidence." *Commissioners of Marion County v. Clark*, 4 Otto (U. S.), 278, 24 L. ed. 59.

"Conflicting evidence is for the jury to weigh, and when there is a conflict in evidence upon a material issue it is error to direct a verdict for either party." *Paxton v. State,* 60 Neb. 763.

The rule has been similarly stated in many decisions of this court, in some with language possibly not so accurate. To say that evidence is conflicting, is to imply that there is substantial evidence upon either side of the controversy. A fact may be so conclusively established by evidence that slight and suspicious evidence will not be allowed to overthrow it. We can not upon this record say that the jury must have found that the plaintiff had established the fact of negligence of the company in not sounding the whistle or ringing the bell. The verdict is a general one, and the jury may have reached its conclusion, under the instruction given by the court, as will be hereinafter shown, without finding this allegation in favor of the plaintiff. We will not assume that, against such overwhelming testimony, the jury has found a fact to be established by negative testimony of such character as this, where the finding and verdict may be accounted for on other grounds.

2. It is insisted that it follows that the court should have instructed the jury to return a verdict for the defendant. The evidence is meager and unsatisfactory as to the condition of the highway as it approached this crossing from the west. It appears that there is a descent in the grade immediately before the crossing is reached, but its extent or precipitancy is not shown. It also appears that the highway passes over a "hill" as it approaches the crossing, but the altitude or decline of this hill is not shown, nor does its distance from the crossing appear except that it was not more than forty rods distant. As before shown, the track as it approached the crossing is in the form of a curve around the base of a hill three hundred or four hundred feet in height and through a deep cut. As to the velocity of the wind, and possibly as to other facts that may have obscured the sound of the whistle, there is a conflict in the evidence.

The train was running at a high rate of speed. The conductor, engineer and fireman of the train unite in testifying that the speed was not greater than forty-five miles an hour. Notwithstanding the weight that is to be given to this testimony on account of the experience of these men in running passenger trains and their acquired ability to make close estimates of the rapidity of the motion of such trains, still it is more or less a matter of judgment or estimate, there being no evidence that any unusual attention was given to the matter by them at the time, or that they had any opportunities for special observation or comparison. The engineer testified that it is a continuous down grade from Murdock to the crossing; that he used some steam during the first mile from that station, but afterwards used no steam, the train apparently accelerating its rate of speed of its own momentum, it being, as he said, a heavy train carrying altogether about three hundred and fifty tons weight. There were other witnesses who saw the train and estimated that its speed was much greater than forty-five miles an hour.

Railway crossings are always places of danger. It is the duty of the company to take all reasonable precautions in constructing crossings to lessen the danger to the public in crossing its road. Whether under the circumstances the deceased can be charged with negligence in not observing the signals given by the engine was a question for the jury. Under these conditions it can not be said that the speed at which the train was running might not of itself render it impossible for one crossing the track at this point to avoid such an accident. The whole question as to whether under all the circumstances the speed of the train was such as to constitute negligence on the part of the defendant should have been submitted to the jury under proper instructions. The court therefore did not err in refusing to direct a verdict for the defendant.

3. The plaintiff presented fourteen requests for instructions to the jury and the defendant presented fifteen. It appears that the trial court made selections from these re-

quests in framing his charge to the jury, and the result was an irreconcilable conflict in the instructions upon several vital points.

In the second instruction given by the court the jury was told:

"The gist of this action is the alleged negligence and wrongful construction of defendant's alleged railroad over and across an alleged highway in Cass county. * * * The alleged negligence of the failure of the defendant to construct and maintain a suitable crossing over its road at such point and to keep such crossing in proper repair."

And this was repeated in the same instruction as follows:

"You are instructed therefore that the issues for you to decide are: Was the defendant negligent in the construction of said crossing; and by cutting of the excavation at said point and the construction of said crossing, did it negligently expose the deceased to unnecessary danger at such crossing."

But in the 7th and 10th instructions the court said:

"7. The jury are instructed, that there is no evidence in this case showing or tending to show that the defendant, the railway company, carelessly or negligently constructed its railway at the point where the collision occurred, or for about a mile to the southwest thereof, and the allegation in the plaintiff's petition in this regard, you should disregard and dismiss from your consideration.

"10. The jury are instructed that the plaintiff in this petition alleges that because of the configuration of the grounds at and about the crossing where the collision occurred and the manner in which the railway approached and crossed the highway, it was necessary, in order that said crossing might be safe, that it should have been constructed either beneath or above said track, or turned north along defendant's right of way twenty rods and parallel with said railway. In this connection you are instructed that no evidence has been offered by the plaintiff tending to prove this allegation in the petition and you will disregard the same in considering your verdict."

It was alleged in the petition and stated in the instructions that when the defendant constructed the railway across the highway it carelessly and negligently constructed the same at a point a half to a mile to the southwest of the crossing, and that the road approached the highway through a deep cut and a steep down grade, and on a heavy curve; that the said cut continued up to and beyond the highway. crossing; that the defendant carelessly and negligently "caused the earth taken from said cut to be piled up on its right of way immediately west of said cut and parallel therewith for a long distance southwest, to wit, about five hundred feet, and thereby caused the track of said road to be buried deep from sight of the traveling public approaching the said railway along the said highway and to the west of said track," and that because of the negligent and careless construction of said railway it was impossible for the traveling public approaching said crossing from the west to see trains approaching said crossing from the southwest from any point along the highway within one mile west of said crossing and "that because of the configuration of the grounds at and about said crossing, and the manner in which the defendant's railway approached and crossed said highway it was necessary, in order that the said crossing might be safe and convenient for use, that the said highway where the said railway crossed the same should have been constructed either beneath or above said track, or that it should have been turned north along defendant's right of way, about twenty rods and parallel with the said railway, where it could have been constructed under said railway and then turned south till it would have intersected the said highway on the west side of said railway; that said highway could have been so changed and arranged without great expense, and the crossing thereof by the defendant's line of railway made safe and secure, yet the defendant, regardless of its duties to the public, negligently and carelessly omitted so to do, but negligently and carelessly permitted its said crossing to remain a dangerous and unsafe way for the traveling public."

There is no evidence that the location of the tracks or making the cuts and embankments were improper or unnecessary in the construction of the road. If therefore the defendant in the construction of the crossing neglected reasonable and proper precautions to guard the safety of the public in passing over this crossing, it should have been shown to the jury in support of the allegation of negligence on the part of the company. The plaintiff attempted to do this by showing that "it is practicable to construct either an underground or an overhead crossing for a highway at the point where the Rock Island road crosses the town line road."

The witness Hilton, who was a surveyor and civil engineer, testified it was not practicable to do either. He stated no reason for his conclusion, but being the plaintiff's witness and the only one on this point, the plaintiff is clearly bound by this testimony, so that the 7th and 10th instructions above quoted were applicable to the evidence. It was the duty of the jury to follow these instructions of the court, and the court erred in giving instruction numbered 2 in conflict with these instructions.

"An instruction which misstates the law is not cured by other instructions stating it correctly, because the jury would be left in doubt as to which paragraph was correct."

"In such case it is impossible to say which instruction the jury followed, and the correct instructions do not cure the error." *Richardson v. Halstead,* 44 Neb. 606.

There are 726 assignments of error largely relating to alleged errors in rulings upon the reception and exclusion of evidence. These questions are not liable to arise upon another trial of the case and their discussion at this time is unnecessary. Other assigned errors are disposed of in the foregoing discussion.

The judgment of the district court is reversed and the cause remanded.

REVERSED.