HERMAN KIELBECK, ADMINISTRATOR OF THE ESTATE OF CHARLOTTE BARTENBECK, DECEASED, v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY.

FILED DECEMBER 16, 1903.    No. 13,180.

1. **Trial: EVIDENCE.** The trial court is not required to submit a case to the jury unless the evidence supporting it is of such a character that it would warrant the jury in basing a verdict upon it, and a fact may be so conclusively established that slight evidence, suspicious and uncertain, will not be allowed to overthrow it.

2. **Verdict: INSTRUCTIONS.** If a verdict is the only one justifiable by the evidence, instructions to the jury will not be examined.

ERROR to the district court for Furnas county: HANSON M. GRIMES, JUDGE. *Affirmed.*

*Ernest B. Perry, Thomas S. Allen, Addison S. Tibbets* and *Walter L. Anderson,* for plaintiff in error.

*J. W. Deweese, Frank E. Bishop* and *J. T. McClure, contra.*

AMES, C.

The track of the defendant company extends easterly and westerly from a point in this state where there is a passenger station, and an unincorporated village called Holbrook. Immediately to the westward of the station the track is crossed at right angles by a public road. About 180 feet north from the crossing, begins a scattered row of houses on the east side of the highway, merging some distance further northward in a cluster of buildings constituting the hamlet. The station house stands on the opposite or south side of the track. From the crossing eastward along the track, 23 feet from it on the north side, measuring from center to center, extends a side track. Strung along the north side of the side track and beginning 74 feet east of the east side of the public road, are the following buildings upon the defendant's right of way: First, a small coal shed, not so large or high as to obstruct a view from the highway of a locomotive headlight; second, at a distance of 208 feet eastward from the coal shed, the intervening space being open and unobstructed, and at about 300 feet from the highway, is a grain elevator, 48 feet in length, along the track; and third, eastward from the elevator, after an interval of 204 feet, or about 600 feet from the crossing, some low, fenced, open cattle pens, commonly known as stock yards. The northern boundary of the defendant's right of way along this space is 150 feet from the main track, and along this northern boundary, adjacent to a public road or street, are standing at intervals some ordinary corn cribs. There was also, at the time below mentioned, a box car standing on the side track immediately east of the crossing. There are ten or more regular trains passing this point daily, but often not on schedule time, and there are occasional special or extra trains, so that the passage of a train, at any time, may reasonably be expected.

At 6:38 o'clock P. M., on the 10th day of October, 1900, one of the defendant's passenger trains arrived from the

east, halted at the station to discharge and receive passengers and express matter, and passed on westward. It was followed shortly afterwards by what is called a "lone engine," that is, a locomotive not hauling any cars except its own tender. There are several guesses by the witnesses as to the interval between the passage of the train and that of the engine, varying between 5 and 20 minutes. The only definite testimony on the point is that of one of the witnesses of the plaintiff, that he arrived at the scene of the accident, below mentioned, at 15 minutes after it occurred, which was 15 minutes past 7 o'clock. The consensus of opinion of all the witnesses is that the train and engine were running at about the same rate of speed, which was estimated at 30 miles an hour. This being, as we are bound to presume it to have been, the fact, the interval of time was 22 minutes, and the train was 11 miles away when the engine arrived at the crossing. Just before the arrival of the latter, a witness named Jaynes drove with a team and buggy from the village toward the track, and when within two or three rods of the crossing saw the headlight, and heard the whistle and bell of the locomotive, and stopped in the road to permit of passage of the latter unobstructed. Immediately afterwards a lumber wagon drawn by two horses, and containing three women and three small children, came on from the north and, turning to one side, drove past him. Once as they were passing, and once afterwards, he cried out to them to "hold on there, a train is coming," or words of that import; but they drove on heedlessly, at a trot, until they collided with the engine. Whether they heard the warning is not known. All the women and one of the children were instantly killed.

The plaintiff, who is administrator of one of the deceased women, contends for four propositions: First, that the structures along the north side of the side track and the right of way were so built as wrongfully or negligently to obscure the approach of trains from the east to persons traveling along the highway, but there is not shown to be

anything unusual about their structure or situation; the approach of the locomotive in question was seen in due season by every witness who was on or near the highway at the time of the casualty, and no one complains of having suffered any inconvenience from this cause at any other time. The complaint is, therefore, clearly without evidence in its support. Second, that the engine was driven at a too great and negligent rate of speed. It does not appear that there was any peculiar or unusual circumstance or condition attending the scene of this accident, and it has been uniformly held, both in this state and elsewhere, that a railway company is not liable in damages resulting from the usual and ordinary operation of its trains, and that outside of thickly populated neighborhoods in and near considerable cities and villages, the rate of speed of a train or locomotive is not, of itself, evidence of negligence. If the law were otherwise, and a rate of 30 miles an hour were adjudged to be such evidence, the so-called "limited" trains and "flyers," in use between the principal centers of population, would be compelled to go out of service. We think that so revolutionary a regulation ought to be left to legislation other than judicial. Third, that the engine and the train were run so near together that the noises of the two were confounded and confusing. Granting the plaintiff's rate of speed, and taking the guess of his lowest witness as to the interval of time, the distance could not have been less than two and a half or three miles, while his other witnesses would make it from five to seven and a half or ten miles; and, besides, no one testifies to having been confused in this manner; one witness merely testifying to the effect that when he first heard the engine nothing had occurred to arrest his attention; and he did not notice but what the noise was that of the train.

Finally, it is said there is a conflict in the evidence as to whether the approach of the engine was duly signaled. We are unable to discover it. All are agreed that a headlight, denoting a "special," was burning, and that a blast

from the whistle was blown at or about the usual place, 80 rods east of the station. Some of the witnesses testify to having heard subsequent blasts, and others that they did not hear them or did not take notice. Similarly with respect to the bell. Jaynes, the witness above mentioned, who alone of all those sworn was in a situation clearly to observe the fact and to have it indelibly stamped upon his memory, testifies, without hesitancy, that it rang continually until the instant of the collision. He is corroborated by two or more others, who testify to having heard the ringing. All the witnesses are, so far as appears, disinterested. One of those who remembers having heard the whistle more than once was called by the plaintiff, but for the plaintiff there are several who say they did not hear, or did not notice the bell. They were not at the time near the crossing, and before the collision there had nothing occurred to attract their particular attention or to fix any circumstance upon their minds, and none of them is willing to go so far as to say that the whistle was not blown repeatedly, or that the bell was not rung continuously.

We do not think that such testimony, though, in this case, no doubt truthful, can be dignified by the name of evidence. There are millions of people in this country who did not see the last partial eclipse of the sun, although it was visible from all parts of the United States, and the sky was clear over nearly the whole territory. People sit for hours in their own quiet homes without hearing the clock strike. Few of the dwellers in the larger cities hear the alarms from the fire department stations, or the whistling of tugs in the harbors. But the clock strikes every hour or oftener; the alarms are sounded frequently, and the tugs blow their blasts almost constantly. There is no class of occurrences which people are less likely to notice or remember than those with which, from frequent repetition, they are familiar, or those which, happening at stated intervals or in connection with other familiar happenings, are expected.

But it is unnecessary to pursue the subject further. This

court seems to us to have set the matter at rest in a recent decision pronounced, after mature deliberation, in *Chicago, R. I. & P. R. Co. v. Sporer,* 69 Neb. 8: "The trial court is not required to submit a case to the jury unless the evidence supporting it is of such a character that it would warrant the jury in basing a verdict upon it," and "A fact may be so conclusively established that slight evidence suspicious and uncertain will not be allowed to overthrow it;" citing to the same effect *Commissioners of Marion County v. Clark,* 94 U. S. 278, 24 L. ed. 59. We think that the rule thus announced applies with accuracy to the case at bar.

It would be possible to presume that that which the plaintiff's witnesses say, merely, that they did not hear, or did not take notice of, did not happen, and that the defendant's witnesses, who testify positively to the clearest recollection of hearing it, and who, therefore, can not be mistaken, are perjured; but surely such a presumption would be supported only by the slightest, most uncertain and most suspicious of testimony. A verdict having so flimsy a foundation could not, under the authorities cited, be upheld. It is unnecessary to discuss the evidence of contributory negligence, which is without conflict and, as it seems to us, conclusive.

At the conclusion of the trial, the court submitted the case to the jury by a series of instructions, which, from a cursory reading, appear to be objectionable only for the reason that they were unnecessary, and the jury returned a verdict for the defendant, upon which a judgment was entered, which the plaintiff seeks to reverse by this proceeding. The plaintiff asks a reversal for the sole reason that, as he contends, the instructions, or some of them, are erroneous, but, even if they be so, the verdict being the only one justifiable by the evidence, he has suffered no prejudice.

It is recommended that the judgment of the district court be affirmed.

HASTINGS and OLDHAM, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, it is ordered that the judgment of the district court be

AFFIRMED.