WILLIAM P. CONN ET AL., APPELLEES, v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, APPELLANT.

FILED JANUARY 31, 1913. No. 17,602.

1. Trial: DIRECTING VERDICT. "The trial court is not required to submit a case to the jury unless the evidence supporting it is of such a character that it would warrant the jury in basing a verdict upon it." *Chicago, R. I. & P. R. Co. v. Sporer*, 69 Neb. 8.

2. Evidence examined and set out in the opinion. *Held*, That a verdict for defendant should have been directed.

APPEAL from the district court for Lancaster county: WILLARD E. STEWART, JUDGE. *Reversed and dismissed.*

*Byron Clark*, for appellant.

*Burr, Greene & Greene*, contra.

FAWCETT, J.

This case is before us à second time. Our opinion upon the former hearing will be found reported in 88 Neb. 732. Reference is made to that opinion for a full and accurate statement of the case. When the case was remanded, it was retried without change in the issues, and again resulted in a verdict and judgment for plaintiffs. Defendant appeals.

The only question presented by this appeal, which we deem it necessary to consider, is one question of fact, viz.: Was the culvert, referred to in our former opinion, and to which the evidence as to the liability or nonliability on the part of the defendant was directed at the last trial, sufficient to drain plaintiff's land? This culvert was what is termed a box culvert, four feet wide by one and a half feet deep, and the question is: Was it set low enough to carry off such surface water as gathered upon plaintiff's land after hard or continued rains? There is no complaint as to the size of the culvert. After heavy rains the whole tract is flooded to the height of the embankments of both the county road and the railroad, the water at times running over both embankments. No complaint is made of that, however; the claim being that after each rain the water will all run off down to the level of the bottom of the culvert. The issue is well defined. Plaintiff's claim is that the culvert is higher than his land, and that after the water has all passed through to the level of the bottom of the culvert the rest of it remains upon his land until it passes away by absorption and evaporation. Defendant's claim is that the bottom of the culvert is six inches lower than the lowest point on plaintiff's land. If the evidence is sufficient to sustain plaintiff's claim, the judgment should be affirmed. If it is not, then the judgment should be reversed.

Plaintiff Conn testified: "Q. Do you know how this culvert compared in elevation with the flooded part of your field? A. Why, yes; I know. Q. Was it higher or

lower than the flooded part of your field. A. It was higher. * * * I know that the bottom of the culvert across the public highway was higher than the low part of my ground. If it had been as low as the low part of my ground, the water would have run through it. After the water quit running out, it would be standing right up to it against it. The culvert was not in a ditch. It was in a road, the public highway. The railroad kept it up. * * * The ditch along the public highway to the culvert was lower than the culvert. The water would stand in my field clear up to this public highway; right up to the highway and the ditch standing full. The bottom of the culvert was just low enough to take the water off of the grade, to protect the public highway." It seems that there was a ditch along the west side of the public road. That is, the plaintiff called it a ditch. Some of the witnesses spoke of it as a borrow-pit, made when the public road was being constructed. We do not think any note should be taken of this so-called ditch. It was not a ditch at all in the sense that it was constructed for any such purpose, and, even if water stood in it at times, plaintiff would have no cause for complaint, as it is not claimed that the ditch was upon his land or that he sustained any damage by reason of its being filled with water. While being examined as to the rains in 1908, plaintiff testified: "I could not get out there to measure how deep the water was. It came from most all over the country. Some of it came from the south. It ran over the grade. The Nemaha Valley got up and flooded right up on top of the grade and off on to my ground. After it quit running, the water did not stand up to the bottom of the culvert all over my ground. It was over part up to the bottom of the culvert, and it was that area of ground that this damage occurred to. The water stood clear out to the public highway and on to it and filled up the ditch, and down at the corner it was up to the bottom of the culvert."

Anthony Bouwens, whose name appears as a coplaintiff

with plaintiff Conn, the latter being referred to throughout the trial as if he were *the* plaintiff, testified: That he and his son owned the land, and that plaintiff Conn farmed it in 1907 and 1908; that he saw the land in 1907, first when it was planted, and again "a couple or three weeks after. It was just about level under the water, which came clear from the north, from the hill and to the bottom from the other quarter, and then it went on close to the road, and then it could not go any further and had to stay there. I went to the railroad where the water went through and tried to get out, but it could not get out there on account of the culvert was not big enough and too high. It was the only way to get it through that little culvert, and that was too small to take the water off in that time when I saw it. I saw the corn after the water had gotten off, it was just cooked and baked." On being recalled, he testified: "The water standing on this 19 acres would just come up to the bottom of the culvert and stand there, it was the standing water that did the damage."

It is urged that the foregoing testimony by the two plaintiffs was sufficient to take the case to the jury and to sustain their verdict. The trouble with the contention is that plaintiffs themselves disproved this testimony, which rested upon their ocular estimates of elevation, by introducing as a witness an experienced engineer whom they had employed to make a survey of the land and take the levels necessary to determine the elevation of the land and of the culvert. Plaintiff Conn testified: "I never took any levels to see whether the culvert was higher than my low ground. I was present when some were taken. Mr. Scott, county surveyor of Lancaster county, took them. He was surveying for me, and I went with him. I told him what I wanted done, showed him where I wanted levels taken, told him what I wanted. Had him take levels across from the east and west road to the north and south road across the right of way, and then the level of this 19-acre field. I do not just remember

where the lowest place was—the lowest place was in the ditch right opposite this culvert. The lowest part of the ground lays right along the public highway just north. You will have to ask Mr. Scott how far from the railroad grade." It will be seen that plaintiff Conn selected Mr. Scott as his expert engineer to make a survey and take the necessary levels to enable him to furnish accurate testimony with reference to the land, the embankments, and the culvert. He followed this up by introducing Mr. Scott as a witness, thereby vouching for his competency; and, judging from Mr. Scott's testimony, we do not think plaintiff made any mistake in selecting him, as he appears to have understood the nature and extent of his commission and to have intelligently executed it. Mr. Scott testified: "The lowest elevation on the land north away from the railroad and river is 113.2. The highest on this piece of land was 116. * * * The lowest point on the 19 acres is 113.2, right at the end of the two parallel lines near the center of the 19 acres, and it would be an exact level of this bank. The culvert is 112.7. The lowest point on the 19 acres would be 6 inches above the bottom of the culvert; that is, the bottom of the culvert now is 6 inches lower than the lowest point on the 19 acres. From that point to the bottom of the culvert is about 450 or 500 feet. There would be a fall of water from the lowest point on this land to the culvert of 6 inches in about 500 feet. * * * The slope is plenty for the water to flow down there. Q. Then, if the water that did the damage to the land, that stood there, was below that point, what would obstruct it, or why wasn't there sufficient room for the water to get away? A. Well, the bottom of that little ravine shows it to be 2 or 3 inches higher between the low point on the land and the culvert. Q. What little ravine? A. The little ravine shown by these parallel lines. Q. Where? A. That drains out to here (indicating). Q. About where is that low point of which you speak, in that ravine? A. I said the points in the ravine were 2 or 3 inches higher than the low points on

the 19 acres. Q. Oh, they are. Where is that? A. Here is a point 113.5. Q. Yes; that is up on the 19— A. About 3 inches higher than the 113.2. Q. But that point is on the 19 acres, isn't it? A. Yes, sir. Q. And what is the next one? A. The next one is 113. Q. That would be .2 lower? A. .2 lower than the high, or 6 inches than the point here (indicating). Q. That being true, the water held at this low point would be held by reason of the rise in the ground from the 19 acres itself, would it not? A. It would hold it 3 inches in depth up here. Q. Would the railroad grade add anything to that? A. It would depend upon the depth of the water on the 19 acres. If it would be deeper than that, then, of course, the railroad grade would help to hold it back." Continuing in narrative form, Mr. Scott testified: "Next to the railroad grade I took the surface of the ground at the fence. The next lowest point to the railroad right of way was 114.5, which would show a line of ground there higher than this out where the elevation in the 19 acres was taken. The water would be held back of this low point by reason of the natural surface of the ground next to the right of way along the fence. It did not reach the grade unless it was deeper than a foot or one and one-half feet lower there. Immediately south of this 19 acres the water could be a foot and a half on there, and yet not get next to the surface of the ground at the right of way. That would be clear down to the first elevation west to the public highway on the north side of the right of way where it was 114.5. The natural surface of the ground there along the fence would be that high, as I found it. Q. Now, then, when you get down then to the public highway, is it not a fact that the water is clear down to that point by reason of the working of this public highway and the throwing up of a slight grade which stops the water in its course east? A. The water is carried down through this ditch. I presume that was made partially anyway to get dirt to fill in the road. This fill would stop the water from going east up as high as the road was, whatever that might be.

Q. So that this public highway is really the thing that deflects the water and flows it off along the public highway? A. Yes; still you could not cross that. Q. And when it gets down to the point and reaches our culvert, then the bottom of our culvert is 6 inches lower than the lowest point on this land; that is true, is it not? A. Yes, sir. Q. So that the water that stood on that 19 acres could get through our culvert, couldn't it, in point of time? A. Yes; in point of time it could." No other testimony was offered by plaintiff with reference to the relative elevation of the land and the culvert. If, as Mr. Scott clearly shows, the bottom of the culvert was 6 inches lower than the lowest point on plaintiff's land, and "the slope is plenty for the water to flow down there," then it is a physical impossibility that plaintiff's damage was the result of any negligence on the part of defendant in the construction and maintenance of the culvert. The simple fact that plaintiffs Conn and Bouwens testified as shown above should not be permitted to weigh against the clear and positive testimony of a competent engineer, whom they introduced, and whose testimony is based upon actual levels and measurements. When plaintiff rested, defendant moved for a directed verdict. The motion was overruled.

"The trial court is not required to submit a case to the jury unless the evidence supporting it is of such a character that it would warrant the jury in basing a verdict upon it." *Chicago, R. I. & P. R. Co. v. Sporer,* 69 Neb. 8. The case at bar comes clearly within that rule. No jury would be warranted in basing a verdict for the plaintiff upon the evidence above outlined. It follows that the trial court erred in not sustaining defendant's motion. For this error, the judgment must be reversed. As plaintiff's case clearly appears to be without merit, it should not be permitted to longer vex the courts.

The judgment of the district court is therefore reversed, and the action dismissed, at plaintiff's costs.

REVERSED AND DISMISSED.

REESE, C. J., dissents.