ANNA RICKERT, ADMINISTRATRIX, APPELLEE, V. UNION
PACIFIC RAILROAD COMPANY ET AL., APPELLANTS.

FILED NOVEMBER 17, 1916. No. 18763.

1. **Railroads: NEGLIGENCE.** The erection and maintenance of conven-
ient structures for the use of the patrons of a railroad at a public
station is not negligence under ordinary circumstances. This
rule applies to one who is entirely familiar with the situation.

2. ————: ————: FINDING: SUFFICIENCY OF EVIDENCE. Testimony
of witnesses that they did not hear the bell rung, or the whistle
sounded, on an engine approaching a public crossing, will not sus-
tain a finding by the jury that such signals were not given, where
such witnesses testified that they were not paying any particular
attention to that occurrence, and that such signals might have been
given without their knowledge, where other witnesses testified
positively that signals were given.

3. ————: ACCIDENT AT CROSSING: CONTRIBUTORY NEGLIGENCE. A
traveler upon a public highway, who attempts to cross a railroad
track in front of an approaching train, if he knew, or ought to
have known, of its approach, is guilty of contributory negligence
which will prevent a recovery for resulting injuries, if the ap-
proaching train was in such close proximity to the crossing that
a reasonably prudent person could not fairly expect to cross in
safety ahead of it.

4. ————: ————: ————. It is the duty of such traveler on a high-
way, when approaching a railroad crossing, to look and listen for
the approach of trains. He must look, where, by looking, he could
see, and listen, where, by listening, he could hear, and if he fails,
without reasonable excuse to exercise such precautions, no recovery
can be had for his death caused by a collision with a passing train.

APPEAL from the district court for Platte county:
GEORGE H. THOMAS, JUDGE. *Reversed.*

*Edson Rich, A. G. Ellick, B. W. Scandrett* and *Albert
& Wagner,* for appellants.

*Reeder & Lightner, contra.*

BARNES, J.

The plaintiff, as administratrix of the estate' of Carl Rickert, her deceased husband, commenced this action in the district court for Platte county against the Union Pacific Railroad Company, Thomas Campbell, Hugh Branson, George McQuade, N. J. Buzza and C. C. Covington to recover damages for the alleged negligent killing of her husband. A trial to a jury resulted in a verdict and judgment for $10,000 against all of the defendants except C. C. Covington. A motion for a new trial was overruled, the defendants excepted, and have brought the case to this court by appeal.

The appellants' first contention is that the trial court erred in refusing to permit the Union Pacific Railroad Company to remove the case to the federal court. It is fairly inferable from the record that the individual defendants were sued jointly with the railroad company in order to prevent a removal of the cause, but we find that the case may be determined without regard to that assignment of error, and therefore it will not be further considered.

The record discloses that the accident, which resulted in the death of Carl Rickert, occurred on the 29th day of October, 1912, at the village of Benton, in Platte county, where the through trains of the defendant railroad company are not scheduled to stop; that plaintiff's decedent who was driving an automobile on a public road, ran against the engine of the second section of defendant railroad company's train No. 9 at a crossing. The train was a through train carrying mail and express matter over defendant railroad company's line of road. After describing the buildings, the equipment of the railroad company, and the surroundings at the place where the accident occurred, the petition alleged that the buildings, structures and box cars were negligently and carelessly so placed as to completely obstruct the view of defendant railroad company's track to the east from any one traveling on the public road referred to; that, on the day

100  Neb.—20

when the accident occurred, Carl Rickert, the deceased, was proceeding west along the public highway above described, driving an automobile, and observing due care; that train No. 21 stood on the side track; that unknown to said Rickert, but known to the defendants N. J. Buzza, George McQuade and C. C. Covington, the second section of train No. 9 was approaching said crossing at a high rate of speed; that it was the duty of defendants to let train No. 21 stand at the depot until train No. 9 had passed, but, in reckless disregard of such duty, they carelessly and negligently began to move said train forward, and while Carl Rickert was proceeding westward upon said public highway, as aforesaid, said train No. 21, under the control of the defendants, was carelessly and negligently moved westward parallel with him, making a great deal of noise, and completely obstructing the view to the east and northeast; that the defendant C. C. Covington, acting as a switchman, stood at a switch upon the railroad crossing; that, notwithstanding the dangerous nature of said crossing, it was entirely unguarded, except by the said switchman, and it was his duty to warn persons approaching said crossing of their danger; that, when said Carl Rickert reached the corner of the public road, he turned north and approached said track; that he was running his motor at a moderate rate of speed, not more than 10 or 15 miles an hour; that he was in plain sight of the conductor and engineer, above named, and of said switchman; that as he approached said track the engine of train No. 21 was 70 or 80 feet east of him, and still running at a very low rate of speed, so that said deceased had ample time to cross the tracks ahead of it; that said switchman, conductor and engineer on No. 21, above named, were aware of the danger which threatened the deceased, and, although it was their duty to warn him of such danger, they carelessly and negligently failed and refused to do so; that at the same time, on the north main-line track, the second section of train No. 9, operated by the defendants Thomas Campbell and Hugh Branson, was carelessly

and negligently and in violation of the law approaching said crossing at a rate of speed of more than 60 miles an hour; that, by reason of the situation above described, said train No. 9 was completely concealed from decedent's view, and such noise as it made was drowned by the noise of the local train; that it was impossible for decedent to see or hear it, and he did not see or hear it until it was almost upon him; that under the circumstances he had a right to believe that the defendants N. J. Buzza and George McQuade and C. C. Covington, or one of them, would warn him if another train was approaching from the east, yet he received no warning; that upon seeing said train from the east he immediately applied his brakes, but before the said car could be stopped said section of No. 9, so approaching him, at an excessive rate of speed, as aforesaid, ran into his said car, completely destroying same and instantly killing the said Carl Rickert. The plaintiff prayed for a judgment of $30,000.

The answer of the railroad company, after denying each and every allegation in said petition contained, not expressly admitted in said answer to be true, denied that its buildings were so located as to obstruct the view of defendant railroad company's tracks, and admitted that plaintiff's decedent was instantly killed by coming in contact with its train No. 9. The answer then alleged that the death of Carl Rickert and the destruction of his automobile were due solely to his carelessness and negligence, and not to any carelessness or negligence on the part of defendant railroad company. The answers of the other defendants were identical with the answer of the defendant railroad company. The reply of the plaintiff to the several answers of the defendants was a general denial.

We have carefully stated the substance of the pleadings because of the conclusion announced by the opinion.

It is the defendants' contention that the verdict and judgment are not sustained by the evidence. The record

discloses that defendants' railroad, where it passes through Benton, consists of two main-line tracks a sufficient distance apart to maintain a passing track between them. They are laid on a grade about four feet above the level of the surrounding country. The village is almost wholly south of the tracks, and between the town and the south main-line track is a street or public highway, called "Front street," which runs westerly until it passes the depot, where it turns north across the tracks at a distance of 137 feet from that structure. After crossing the tracks it runs westerly along the right of way. The depot is 60 feet long, and is 24.5 feet south of the south main-line track. At a short distance east is a small toilet room about 9 feet square, and 137 feet east of the toilet room is a coal shed about 60 feet long. A considerable distance east of the coal shed there is an elevator called the "Hord" elevator. Some distance farther east is another elevator. The east-bound trains of the defendant railroad company use the south main-line track, and the west-bound trains are run on the north main-line track. About the time the accident occurred defendant railroad company's train No. 21 had arrived at the depot from the east, had discharged its passengers and baggage, and, according to the rules of the company, had backed down to the east and stood on the passing track in order to allow the second section of train No. 9 to pass on the north main-line track.

Plaintiff's witness, John Rickert, testified, in substance, that the deceased at the time of his death was 29 years old; that his health was good, and he was capable of earning $1,000 or $1,500 a year; that deceased's hearing and eyesight were both good; that he lived on a farm in plain sight of defendant railroad company's tracks; and that he had no children.

Henry Hoppe, one of plaintiff's witnesses, testified, in substance, that he was living in Benton in October, 1912, and was within 125 feet of the point where Rickert was killed; that when he first saw Rickert he was stand-

ing by his automobile; that he had difficulty in getting his car started, and when he got it started he turned around and traveled westward. Witness was a little west of the point where the wagon road turns north across the tracks. He testified that, while traveling west toward the corner where he made the turn, Rickert was going from 12 to 15 miles an hour; that he saw Rickert's car as he proceeded north over the tracks, and that as Rickert was traveling north the engine of train No. 21 was about 75 feet from the place of the accident. Witness said he paid no attention to this train as to whether it was in motion or not. He stated that the wagon road is not less than four feet lower than the railroad tracks, and that as it turns north it starts to raise to the level of the railroad grade from 30 to 35 feet from the track. When witness saw Rickert turn north to cross the tracks, he called to him and warned him. When he called to Rickert his head was turned toward the northeast. The wind was blowing from the northwest, and witness was located close to and west of Rickert. Witness was talking with Henry Heible when he saw Rickert go by. Witness saw train No. 9 when he saw Rickert turn north. When he first saw second No. 9 it was very far east of the elevator and was within his vision for about a mile. When he first saw Rickert, he saw the train, which was east of him possibly a mile or more. A person at the point where the wagon road turns north and from there to the railroad track could not see No. 9 approaching under conditions that day. Witness could not see Rickert's car as it struck the train. The engine of the car was still running after the accident and the machine appeared to be out of gear. Witness testified that he did not hear second No. 9 blow any whistle or give any warning of its approach to the crossing, but on cross-examination he said: "Q. You are not prepared to say that they did not whistle? A. No, sir. Q. You are not prepared to say that No. 9's bell wasn't ringing, either? A. No, sir. * * * Q. Were

you paying any particular attention as to whether the train was whistling or ringing the bell, or not? A. No, sir; I was not." Witness further testified that trains passed through Benton at all hours of the day as fast as they go any place. Second No. 9 passed through there at about that time every morning. It is a fast train and does not stop at Benton. No. 21 frequently side-tracks at Benton for No. 9 to pass.

Witness Heible's testimony was, in substance, the same as that given by witness Hoppe.

George McQuade, called for plaintiff, testified, in substance, that he was the engineer on train No. 21 on the day of the accident; that the train consisted of three coaches and two baggage cars. The coaches were about 60 feet long. One of the baggage cars was 50 feet long. The engine and tender together were between 70 and 75 feet long.

M. C. Cassin testified, in substance, that he sold the automobile in question to Rickert; that the car, when running at 10 or 12 miles an hour, could be very easily stopped in 10 or 15 feet.

The plaintiff's testimony related solely to the fact that she was the widow of Rickert, and as to the amount of his earnings per year. She stated that deceased sometimes went to Benton once a week, and sometimes not that often; that when she went with him they went over the main road which leads to Benton, which is the road on which the accident occurred; that trains could be seen from their home, passing over the Union Pacific railroad tracks.

John Saalfeld, Sr., testified that he was unloading a corn sheller and gasoline engine from the box car standing west of the Hord coal shed. Before the accident he saw Rickert going west. Prior to that he had seen him standing in front of John Smith's store. When driving up to the box car, witness saw train No. 21, but did not know where Rickert was then. The engine of train No. 21 was coming out from behind the Hord coal shed. When

he saw Rickert going west across the sidewalk in front of the saloon, No. 9 was pulling in. He did not hear the whistle or the bell. On cross-examination he further testified that he did not say that No. 9 did not whistle, and could not say whether No. 9 was ringing the bell or not. When he saw No. 9 passing, he said to the boys: "I am afraid Mr. Rickert is going to get hit by No. 9." He testified that he got down and ran around the west end of the depot.

John Smith, Sr., testified that he saw Rickert traveling west on the road south of the railroad track; that his place of business is about 500 feet from the place of the accident; that he could see the crossing from his place of business, and saw the car come in contact with the engine of No. 9; that while Rickert was going west he was proceeding at the rate of 15 or 20 miles an hour; that he turned to go north over the crossing, and was running slower. Witness testified that he saw second No. 9 north from where he was standing; saw No. 21 when Rickert was traveling west on the road south of the railroad; did not hear the bell on No. 9; did not know that it was No. 9 until it was close to where Rickert was struck; his attention was drawn up there when he was driving that way, and he paid no attention to No. 9; he knew it was coming by the action of the train crew there, and the way they had been switching; he heard the noise of No. 9 when they got close there; could not swear that the bell was not ringing, nor that the whistle was not sounded

A. L. Branson, the engineer of second No. 9, testified, in substance, that his engine was traveling at the rate of 40 miles an hour as it went through Benton. The schedule time through Benton was 44 miles an hour. The train was not making schedule time through the town on the day of the accident because, when approaching Benton, he thought No. 21 was standing at the depot, and so slowed down, because, under the rules, he was not allowed to pass a passenger train while it was standing

at the depot; but, when he found that No. 21 was away from the depot, he started on again.

The foregoing is the substance of the testimony introduced by plaintiff on which she sought to recover.

George McQuade, when called as a witness for defendant railroad company, stated that he was an engineer on the Union Pacific railroad for 16 years, and was engaged in railroading for 27 years; was the engineer on engine No. 21 on the day of the accident; was due to arrive at Benton at 11: 38, but arrived there four minutes ahead of time; pulled the train onto the passing track and up to the depot. After remaining at the depot long enough to unload and load the baggage and passengers, he then backed down east to where the tool house is on the north side of the track; backed down there because second No. 9 was about to pass them, and under the rule of the company they could not pass them while their train was standing at the depot. This is done because, when the passenger train is standing still, passengers are continually getting on and off, and they aim to have a waiting train moving when another train passes, so that the passengers are quiet on their own train and out of the way of the other train. Witness first noticed the automobile approaching the track when it was about on the grade of the road leading up to the track. Everything happened so quickly that he could not tell the speed of the automobile, but thought it was running about 20 miles an hour; thought the automobile struck the engine right back of the cab. When second No. 9 approached, he could see the steam rising from the engine four times, which indicated to him that it was whistling for the crossing, but did not hear it because he was inside of his engine and the air pump and blower were going. When it passed him he heard it whistle for the crossing, two long and two short blasts of the whistle—the regular crossing whistle.

N. J. Buzza, conductor for the Union Pacific Railroad Company for 23 years, and who was the conductor on

train No. 21 on the day of the accident, testified, in sub-
stance, that after doing the station work at Benton his
train backed down to a point where it was about opposite
the tool house, remaining there three or four  minutes.
When second No. 9 got within about 100 yards of his
train, they started to move westward; heard second No. 9
whistle for the station one long blast of the whistle; heard
it whistle for the crossing just ·before the accident occur-
red, two long and two short blasts of the whistle, when it
was about a quarter of a mile east; could not tell if the bell
was ringing, because after hearing the crossing whistle. he
went inside of his train and closed the door, but heard
second No. 9 whistle again for the crossing just as it passed
his train.   When No. 9 passed it was making lots of noise
by the working of the engine.

John P. Waylander, a fireman for the Union Pacific
Railroad Company for seven years, testified that he was
fireman on No. 21 at the time of the accident; that, after
doing station work at Benton, the train backed up to a
point opposite the west elevator; did not hear No. 9 whistle
for the station or crossing because he had the blower open
on his engine and was putting in coal; also moved west-
ward slowly when second No. 9 passed; did not see the
accident.

C. C. Covington, for the defendant, testified that he was
brakeman for the Union Pacific Railroad Company for
four years; was on No. 21 at the time of the accident; that
he went to the crossing for the purpose of opening the
switch west of where the accident occurred; heard second
No. 9 whistle one long blast of the whistle for the station
at Benton; heard second No. 9 whistle for the crossing
west of the depot; heard it whistle for the crossing again
when he was at the switch; the first time second No. 9
whistled for the crossing it was east of the rear of train
No. 21; when they whistled for the crossing the second
time, it was between the engine of No. 21 and the depot;
when. the crossing whistle was blown the second time he
was in the act of unlocking the switch; saw Rickert's auto-

mobile as it struck the gangway of the engine of second
No. 9. Witness testified that just as Rickert got up to the
engine he made an effort to turn the steering gear of the
front wheel; the bell was ringing on second No. 9 at the
time; first heard the bell ringing when the engine whistled
for the crossing; it was ringing as it approached the cross-
ing; the weather was clear at the time of the accident.

A. L. Branson for the defendant testified that he was the
engineer on second No. 9 on the day of the accident. He
testified that he went by the station depot at Benton at
11: 42 a. m.; blew the station whistle for Benton at the
whistling post, which is not quite a mile east of the depot;
blew the whistle for the crossing west of the depot at the
crossing whistling post, which was about 80 rods from
the crossing, being two long and two short blasts of the
whistle; blew the whistle for the crossing again when
he was near the tool house; No. 21 was at the side of
him then; blew the whistle for the crossing the second
time because he saw the brakeman walking ahead, and
wanted to call his attention to the fact that second
No. 9 was coming, for fear he might step out; did not see
Rickert approaching the crossing in his automobile.
Witness further stated that he started to ring the bell,
which is operated automatically, down by the whistling
post; the bell rang continually until he passed over the
crossing; that the bell on his engine weighed 200 pounds
and made lots of noise. It was in good condition and
could be heard a long way. He further testified that he
first knew that there had been a collision when the fire-
man spoke to him about it; that his train was a fast
mail and express train, and passes through Benton
about that time every morning; that after the collision
he examined the engine tender and saw marks on it which
indicated that the automobile struck the front edge of the
tank. He stated that it broke off the gangway step lead-
ing into the cab and the box cover on the front truck of the
tender of the tank and knocked some of the steps off of the
first car back of the engine; that the pilot of the engine

had no marks on it at all. Witness testified that the fireman he had with him on that day died about three weeks before the trial. When he was passing through Benton on that day the fireman was sitting on the box seat on the left hand side of the engine, looking out westward ahead of the train.

The brakeman on second No. 9 on the day of the accident testified that the engine bell on his train was rung and the whistle was sounded for both the station and the crossing at Benton. The conductor of that train testified that the warning signals were given as the train approached the station and the crossing in question. He also described the place where the automobile struck the engine and the speed of his train as it passed through Benton. Others testified that the speed was 41.2 miles an hour. The record also shows the number of trains per day which pass that station. It is conceded that second No. 9 was not scheduled to stop at Benton. Many other witnesses testified that they distinctly heard the warning signals of the train given as it approached the crossing. Among those testifying was Miss Emma Ketchmark, who had no interest in the controversy. She testified that she distinctly heard the warning signals given. In fact, it appears from the record that every one at and about the station and that part of the village knew that the train in question was coming for a considerable time before it reached the crossing.

It appears that the tool house spoken of is 660 feet east of the crossing where the accident occurred.

The foregoing is a fair statement of the evidence introduced by both plaintiff and defendants. As we view the record, it contains no testimony tending to establish negligence on the part of defendant railroad company or its employees. The erection and maintenance of the depot and other structures situated on or near the defendant railroad company's tracks in the village of Benton are much the same as those found at like stations on all railroads, and were evidently constructed for the use and convenience of

the patrons of the road. They had been maintained in the same condition for many years, and were entirely familiar to the plaintiff's decedent. No witness gave evidence tending to establish negligence on the part of the trainmen of train No. 21. It clearly appears that those in charge of second No. 9 exercised every reasonable effort to give warning of the approach of the train. As to the signals, the evidence of persons who did not hear the crossing whistle or the ringing of the bell of second No. 9, and who testified that they were not paying attention to the sounds, and that they might have been given without their knowledge, was not sufficient to carry the case to the jury on that allegation of negligence, for the reason that it was not sufficient to contradict the positive testimony of the many witnesses who heard the whistle sounded and the bell rung. *Hajsek v. Chicago, B. & Q. R. Co.*, 5 Neb. (Unof.) 67; *Chicago, R. I. & P. R. Co. v. Sporer*, 69 Neb. 8; *Brown v. Chicago, B. & Q. R. Co.*, 88 Neb. 604; *Zancanella v. Omaha & C. B. Street R. Co.*, 93 Neb. 774; *Hoffard v. Illinois C. R. Co.*, 138 Ia. 543; *Ives v. Wisconsin C. R. Co.*, 128 Wis. 357; *Rich v. Chicago, M. & St. P. R. Co.*, 149 Fed. 79.

It is contended by appellants that Rickert's death was caused by his own contributory negligence. As we read the record, one of two things occurred, either of which defeats plaintiff's action. If Rickert saw second No. 9 approaching from the east when he started his automobile in front of the bank, and sought to beat it to the crossing, then plaintiff is not entitled to recovery. If Rickert failed to look and listen for the approaching train, which he might have seen and heard, and refused to heed or understand the warnings given him by others, he carelessly and negligently drove his automobile to his death. In that event, the plaintiff must also fail in her action.

It seems clear to us that, if Rickert had looked to the east when he started his automobile, he must have seen second No. 9 approaching from that direction, and, if he had been paying any attention to his own safety, he must have heard the approach of the train in time to have pre-

vented the accident which cost him his life. It appears that, as he turned north to cross the railroad tracks, he was looking to the east from where second No. 9 was approaching, and at that instant he was warned of its approach by those standing at the turn of the road. Again, if he had been looking out for his own safety, he had ample opportunity to see the approaching train from several points along his route from the bank to the crossing. If it be conceded that there was some actionable negligence on the part of the defendant railroad company, or its servants, still the plaintiff could not recover.

A traveler on the highway who, being aware of an approaching train at a railroad crossing, attempts to beat the train over the crossing must suffer the consequences of his own experiment. *Koester v. Chicago & N. W. R. Co.*, 106 Wis. 460; *Thomas v. Central of G. R. Co.*, 121 Ga. 38; *Chicago & E. I. R. Co. v. Chancellor*, 165 Ill. 438; *Storrs v. Grand Trunk W. R. Co.*, 142 Mich. 375; *Lake Erie & W. R. Co. v. Pence*, 24 Ind. App. 12.

It is the duty of a traveler at a railroad crossing to assume a present danger which includes the immediate approach of a train within a dangerous distance. The duty of due care is not discharged unless the traveler looks and listens at a place where looking and listening will be effective, unless a reasonable excuse exists for failing so to do. *Chicago, B. & Q. R. Co. v. Yost*, 61 Neb. 530; *Harrington v. Rutland R. Co.*, 89 Vt. 112.

In *Chase v. New York C. & H. R. R. Co.*, 208 Mass. 137, the court say that it is far more incumbent on the driver of an automobile to exercise control over his conveyance than it is upon the driver of a horse-drawn vehicle. The same rule was applied in *Gage v. Atchison, T. & S. F. R. Co.*, 91 Kan. 253, *Glick v. Cumberland & W. E. R. Co.*, 124 Md. 308, and *Fort Wayne & N. I. T. Co. v. Schoeff*, 56 Ind. App. 540.

In the case at bar, as in *Chicago, B. & Q. R. Co. v. Munger*, 168 Fed. 690, the physical facts conclusively show that either Rickert did not look and listen for the approaching

train or that, if he did so, he undertook to cross in front of an eminently threatening danger which he must have both heard and seen. In the one case he was guilty of inexcusable negligence, and in the other of inexcusable recklessness. In either event, according to the well-settled authorities, he was guilty of such contributory negligence as precludes recovery in this action.

The judgment of the district court is therefore reversed and the cause is remanded for further proceedings.

REVERSED.